# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| |
|---|
| PAUL DOUGLAS BURKE, |
| Plaintiff, |
| v. |
| AIR SERV INT'L, INC., et al., |
| Defendants. |

Civil Action 07-02335 (HHK)

## MEMORANDUM OPINION

Paul Douglas Burke brings this action against Air Serv International, Inc. and the Louis Berger Group ("LBG"), seeking to recover for personal injuries resulting from a 2004 ambush in Afghanistan, where Burke was working as a security contractor. Alleging negligence and intentional infliction of emotional distress, Burke seeks compensatory and punitive damages.[1] Before the Court is defendants' motion for summary judgment [#31]. Upon consideration of the motion, the opposition thereto, and the record of this case, the Court concludes that the motion must be granted.

## I. BACKGROUND

This case arises from an incident that occurred in the Afghan village of Taluqan[2] on February 22, 2004. At the time, defendant LBG, a construction management company, was overseeing the construction of roads, schools, clinics and power stations in Afghanistan, pursuant

---

[1] Because the parties are diverse and the amount in controversy exceeds $75,000, *see* Compl. ¶ 22 (seeking not less than $7,000,000), the Court has diversity jurisdiction over this action under 28 U.S.C. § 1332.

[2] The parties sometimes spell the name of the village "Thaloquanin."

to a contract with the United States Agency for International Development ("USAID"). LBG had engaged defendant Air Serv to provide helicopter transport to the sites of the work it was overseeing. Burke, a former British soldier, was at the time employed by U.S. Protections and Investigations, Inc. ("USPI"), a private security contractor, Burke Decl. ¶ 3, which was in turn engaged by LBG to provide security for various projects in Afghanistan. Burke was initially assigned to LBG's road construction project. Burke Decl. ¶ 4; Defs.' Mem. Ex. A (Burke Dep.) at 39–40. Then, in early 2004, USPI offered to place Burke in charge of security for LBG's "schools and clinics" project.[3]

In anticipation of assuming command of security for the schools and clinics project, Burke authored a memorandum addressed to USPI's other security agents, *see* Defs.' Mem. Ex. F (USPI SC's Briefing for Schools and Clinics), that outlined what Burke saw as the tenuous security situation in Afghanistan. Burke Dep. at 123–25. The memorandum recommended various steps that could be taken to improve USPI's security measures. It is unclear, however, whether Burke ever showed the memorandum to anyone.

On February 21, 2004, Burke joined LBG engineer Suzanne Wheeler-Wallace as she embarked on a trip to survey the progress of various LBG school and clinic projects. Burke was accompanied by Tariq Nazarwall, his USPI interpreter and driver. The party set out from Kabul in an Air Serv helicopter, piloted by Mark Burdorf. Burke and Nazarwall were both equipped

---

[3]  Burke asserts that there is a genuine issue of material fact as to whether LBG was under contract with USAID in 2003–2004. Pl.'s Statement of Genuine Issues of Material Fact at 2. At his deposition, however, Burke himself asserted that LBG was operating under contract with USAID, *see* Burke Dep. at 47, and none of the materials to which he now points contradict that assertion. Further, the existence of such a contract is immaterial to the resolution of this case. So too the existence of a contract placing USPI in charge of security on the schools and clinics project at the time of the ambush (about which the parties similarly disagree).

with small arms. On the morning of February 22, the party flew to Taluqan. When they arrived in the village, Wheeler-Wallace left the helicopter with Nazarwall to inspect the building site, while Burdorf remained. Burke patrolled the area between the helicopter and the building site. Burke Dep. at 192–93. When Wheeler-Wallace had completed her inspection, she and Nazarwall returned to the helicopter and strapped in, while Burdorf prepared to take off. Burke Dep. at 196. As Burke climbed into the helicopter, unknown assailants opened fire on the party. The firing lasted roughly thirty minutes, during which time Burke took shelter next to the helicopter and returned fire. Burke Dep. at 214–17. During the firefight, Burke sustained five gunshot wounds, including one that shattered his left knee. Wheeler-Wallace was seriously wounded, and Burdorf was killed. Nazarwall was able to use a satellite phone to call for help, which arrived roughly one hour later.

Following a lengthy rehabilitation, Burke regained only partial use of his left leg. Burke Dep. at 215. Burke returned to work for USPI in Afghanistan in late 2005. He remained for four months, and then resigned. Burke Dep. at 252–54. Burke subsequently filed this action, alleging that defendants were negligent in their security measures, were negligent in hiring and retaining USPI, and intentionally inflicted emotional distress on Burke by recklessly placing him in danger. He asserts that defendants were "negligent about helicopter security, security training, security equipment and protection, security intelligence[,] and flight and security permissions." Pl.'s Opp'n to Defs.' Mot. ("Pl.'s Opp'n") at 2. In particular, he challenges defendants' failure to provide armor and other protective gear for the helicopter and its occupants. Compl. ¶¶ 32–33. Defendants have moved for summary judgment.

3

## II. LEGAL STANDARD

A motion for summary judgment should be granted only if the moving party shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The moving party's "initial responsibility" consists of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting FED. R. CIV. P. 56(c)).

If the moving party meets its burden, the burden then shifts to the non-moving party to establish that a genuine issue as to any material fact actually exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To meet its burden, the non-moving party must show that "the evidence is such that a reasonable jury could return a verdict" in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Such evidence must consist of more than mere unsupported allegations or denials and must set forth specific facts showing that there is a genuine issue for trial. FED. R. CIV. P. 56(e); *Celotex*, 477 U.S. at 322 n.3. If the evidence is "merely colorable" or "not significantly probative," summary judgment must be granted. *Anderson*, 477 U.S. at 249–50.

## III. ANALYSIS

To resolve defendants' motion for summary judgment, the Court must first determine what body of law governs this diversity action. Next, the Court will address Burke's contention that a particular feature of District of Columbia tort law — an expert testimony requirement —

does not apply to his specific claims or to any claims brought in federal court. Finally, the Court will turn to defendants' argument that Burke assumed the risk of his injuries.

A.      **District of Columbia Law Governs this Action**

Federal courts sitting in diversity apply the choice-of-law rules of the forum where they sit, in this case the District of Columbia. *GEICO v. Fetisoff*, 958 F.2d 1137, 1141 (D.C. Cir. 1992). To resolve choice-of-law questions in tort cases, the District's courts employ a modified governmental interest test, which is designed to "identify the jurisdiction with the 'most significant relationship to the dispute.'" *Drs. Groover, Christie & Merritt v. Burke*, 917 A.2d 1110, 1117 (D.C. 2007) (quoting *Hercules & Co. v. Shama Rest. Corp.*, 566 A.2d 31, 41 & n.18 (D.C. 1989)). Before identifying that jurisdiction, however, the Court must determine whether the laws of the potentially interested jurisdictions actually vary; if not, forum law applies by default. *GEICO*, 958 F.2d at 1141.

Here, the parties identify four potentially interested jurisdictions: the District of Columbia, Florida, New Jersey, and Virginia, each of which is either the place of incorporation or the primary place of business of one of the parties.[4] Defendants argue that the laws of these

---

[4] Burke also mentions Maryland and Texas, but neither has any plausible interest in this case. Maryland is mentioned solely because District courts "commonly look to Maryland law for guidance in the absence of their own precedents." Pl.'s Opp'n at 12. This fact is irrelevant to the Court's choice-of-law inquiry. Similarly, Texas is mentioned only as the location where Burke's employment contract with USPI was signed; however, USPI is not a party to this suit, and there is no suggestion that any choice-of-law provision in that contract applies to Burke's tort suit against these defendants. *See* Pl.'s Opp'n at 11. Likewise, the Court does not consider Afghan law because neither party desires that it apply here, and no party has given notice of intent to raise an issue of foreign law. *See* FED. R. CIV. P. 44.1; RESTATEMENT (SECOND) OF CONFLICTS OF LAWS § 136, cmt. h (1971) (courts decline to apply foreign law "where either no information, or else insufficient information, has been obtained about the foreign law").

5

jurisdictions are substantially identical such that District law, as the forum's law, should apply by default. Burke disagrees, but, strangely, does not argue that *any* particular jurisdiction's law should apply.[5] Regardless, defendants are correct.

In the District of Columbia, a plaintiff alleging negligence must present expert testimony to establish the applicable standard of care "where the subject presented is 'so distinctly related to some science, profession or occupation as to be beyond the ken of the average layperson.'" *Beard v. Goodyear Tire & Rubber Co.*, 587 A.2d 195, 200 (D.C. 1991) (quoting *Toy v. District of Columbia*, 549 A.2d 1, 6 (D.C. 1988)). Florida, New Jersey, and Virginia all apply a variant of this rule. *See Evans v. McDonald*, 313 F. App'x 256, 258 (11th Cir. 2009) (under Florida law, "when the facts of the case are such that the duty owed and the applicable standard of care are not common knowledge, expert opinion is necessary to establish a breach"); *Bd. of Supervisors v. Lake Servs., Inc.*, 440 S.E.2d 600, 602 (Va. 1994) (expert testimony is generally required "in cases involving the practice of professions requiring advanced, specialized education, such as engineering, medicine, and law, or those involving trades that focus upon scientific matters, such as electricity and blasting, which a jury cannot understand without expert assistance"); *Butler v. Acme Markets, Inc.*, 445 A.2d 1141, 1147 (N.J. 1982) ("The test of need of expert testimony is

---

[5] Rather than argue that any given state's law should control, Burke suggests that the Court apply the "most convenient" body of law, that of the Restatement of Torts. Pl.'s Opp'n at 12. To follow such a course would be improper. Several decades ago, the Supreme Court unequivocally rejected the proposition that federal courts sitting in diversity may exercise their "independent judgment" as to what rules of decision govern the cases before them. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 71–80 (1938). Burke's subsequent assertion that the Court in fact need not determine the governing law at all because "this . . . is a suitable project for briefing at trial," Pl.'s Opp'n at 12, is likewise without merit; a plaintiff cannot bypass the summary judgment stage of litigation simply by declining to specify which body of law creates her right to relief.

whether the matter to be dealt with is so esoteric that jurors of common judgment and experience cannot form a valid judgment as to whether the conduct of the party was reasonable."). Accordingly, defendants are correct that there is no conflict here, and the District's law applies by default. *GEICO*, 958 F.2d at 1141.

**B.     The District's Expert Testimony Requirement Applies to Burke's Claims**

Notwithstanding the fact that District law governs here, Burke presents two additional arguments why the Court should not apply the expert testimony requirement described above to his claims: first, he contends that the District's requirement for expert testimony in negligence cases is a procedural "rule of evidence" and thus does not apply in federal court, even where the District's substantive law applies. Second, he argues that his claims are not beyond the ken of the average juror such that an expert is needed under the rule. The Court addresses each argument in turn.

      **1.      The District's Expert Testimony Requirement is Substantive and Applies in Diversity Actions**

Under the doctrine of *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938), as explicated in *Hanna v. Plumer*, 380 U.S. 460 (1965), "federal courts [sitting in diversity] are to apply state substantive law and federal procedural law." *Id*. at 465. This command applies equally to state court decisions and statutes, *id.*, and applies to the District of Columbia as well as to the states. *Novak v. Capital Mgmt. & Dev. Corp.*, 452 F.3d 902, 907 (D.C. Cir. 2006). Under this framework, a necessary threshold inquiry is whether there is a federal rule or statute that conflicts with the state rule at issue. If so, the federal rule governs. *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 27 (1988).

Burke asserts that the District's expert testimony rule conflicts with, and is thus superseded by, Federal Rule of Evidence 702, which governs the admissibility of expert testimony. *See* FED. R. EVID. 702. Here, Burke confuses two distinct issues: whether a *particular* witness will be *allowed* to testify as an expert, which is governed by the Federal Rules, and when expert testimony *in general* is *required*, which is the subject of the District's rule. There is no conflict here. A federal court applying the District's rule will still determine whether a given witness is "qualified [to testify] as an expert by knowledge, skill, experience, training, or education," *id.*, within the meaning of Rule 702. Accordingly, the District's rule does not, as Burke contends, contravene the federal judge's "gatekeeping role" with regard to expert testimony.[6]

Having concluded that the District's rule does not conflict with any federal provision, the Court must next determine whether the rule is "substantive" or "procedural" within the meaning of the *Erie* doctrine. Although that line can be difficult to draw, decades of Supreme Court precedent have refined the inquiry. The Court must ask: "Would application of the [standard] . . . have so important an effect upon the fortunes of one or both of the litigants that failure to [apply] it would [unfairly discriminate against citizens of the forum State, or] be likely to cause a plaintiff to choose the federal court?" *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 428

---

[6] *See* 29 CHARLES ALAN WRIGHT & VICTOR JAMES GOLD, FEDERAL PRACTICE & PROCEDURE § 6263 (1st ed., 2010 update) (noting that while the federal rules "usually control admissibility issues . . . state law should control a few issues related to the admissibility of expert testimony that are actually substantive in nature," such as where state law "makes a precondition to recovery in a medical-malpractice action the proffer of expert testimony to prove an element of the substantive-law claim, *such as standard of care* . . . ." (emphasis added)).

8

(1996) (quoting *Hanna*, 380 U.S. at 468) (alterations in original) (internal quotation marks omitted). Neither party squarely addresses this question.[7]

The Court concludes that the expert testimony rule is substantive in the meaning of *Erie* such that it applies in this case. The rule imposes a significant hurdle that plaintiffs would plainly rather avoid. If the federal courts in the District declined to apply it, plaintiffs would have a dramatic incentive to forum shop. *Cf. Chamberlain v. Giampapa*, 210 F.3d 154, 161 (3d Cir. 2000) (federal courts would promote forum shopping if they declined to apply a state rule requiring an expert affidavit of merit in medical negligence cases). Additionally, although the rule could be described as "procedural" in that it dictates the process by which a plaintiff must prove the elements of her negligence claim, other federal courts have concluded that similar rules are "so closely interrelated with the substantive cause of action . . . that federal courts sitting in diversity cases should apply the state rule in order to fully realize state substantive policy." *Hemingway v. Ochsner Clinic*, 722 F.2d 1220, 1225 n.10 (5th Cir. 1984); *see also Wallace v. McGlothan*, 606 F.3d 410, 419 (7th Cir. 2010); *Chamberlain*, 210 F.3d at 161; *Pesantes v. United States*, 621 F.2d 175, 176 (5th Cir. 1980). Finally, although the D.C. Circuit has not

---

[7] Defendants simply assert that the rule is part of the District's substantive negligence law. Burke, for his part, proffers several novel objections to the rule's application, including that it allows an expert to testify on a question of law, that it will create a "cottage industry in appeals," Pl.'s Opp'n at 15, and that applying the rule to an incident that occurred outside of the District would be illogical. The merits of these arguments aside, none of them addresses the "twin aims" of *Erie*, namely "discouragement of forum-shopping and avoidance of inequitable administration of the laws." *Hanna*, 380 U.S. at 468.

9

directly addressed whether the rule at issue here is substantive or procedural under *Erie*, it has applied the rule in numerous diversity cases.[8] This Court will follow the Circuit's example.

> 2. **Burke's Claims Are Beyond the Realm of Common Knowledge and Everyday Experience**

Under the District's rule, plaintiffs alleging negligence must offer expert testimony to establish the relevant standard of care unless the "negligent conduct is alleged in a context which is within the realm of common knowledge and everyday experience." *Beard*, 587 A.2d at 200. This rule has been applied in a wide variety of cases, "even in those that might initially seem to fall within jurors' common knowledge." *Godfrey v. Iverson*, 559 F.3d 569, 572 (D.C. Cir. 2009).[9] In particular, "expert testimony is routinely required 'in negligence cases . . . which involve issues of safety, security and crime prevention.'" *Id.* (quoting *Briggs v. Wash. Metro. Area Transit Auth.*, 481 F.3d 839, 845 (D.C. Cir. 2007)). The rule applies not only to claims of ordinary negligence, but also to claims of negligent hiring and retention, *Farooq v. MDRB Corp.*,

---

[8] *See, e.g.*, *Godfrey v. Iverson*, 559 F.3d 569, 571–72 (D.C. Cir. 2009); *Briggs v. Wash. Metro. Area Transit Auth.*, 481 F.3d 839, 845 (D.C. Cir. 2007); *Kaempe v. Myers*, 367 F.3d 958, 966 (D.C. Cir. 2004); *Butera v. District of Columbia*, 235 F.3d 637, 659 (D.C. Cir. 2001); *Nat'l Tel. Co-op. Ass'n v. Exxon Mobil Corp.*, 244 F.3d 153, 154 (D.C. Cir. 2001); *Daskalea v. District of Columbia*, 227 F.3d 433, 455 (D.C. Cir. 2000).

[9] *See, e.g.*, *Katkish v. District of Columbia*, 763 A.2d 703, 706 (D.C. 2000) (maintenance of leaning trees); *Scott v. James*, 731 A.2d 399, 400 (D.C. 1999) (application of hair relaxer); *Tillman v. Wash. Metro. Area Transit Auth.*, 695 A.2d 94, 97 (D.C. 1997) (tightness of handcuffs); *Messina v. District of Columbia*, 663 A.2d 535, 538 (D.C. 1995) (cushioning for the ground underneath playground monkey bars); *Rajabi v. Potomac Elec. Power Co.*, 650 A.2d 1319, 1322 (D.C. 1994) (maintenance of street lights); *Lenkin-N Ltd. P'ship v. Nace*, 568 A.2d 474, 479 (D.C. 1990) (time frame for ordering building materials on a construction project); *Toy*, 549 A.2d at 7 (response when a prisoner is found hanging in his cell); *District of Columbia v. Freeman*, 477 A.2d 713, 719–20 (D.C. 1984) (installation of "a crosswalk, instead of a stop sign, light, or crossing guard").

275 F. App'x 11, 12 (D.C. Cir. 2008), and of intentional infliction of emotional distress. *Edwards v. Okie Dokie, Inc.*, 473 F. Supp. 2d 31, 46 (D.D.C. 2007).

Defendants assert that expert testimony is needed here because Burke's allegations raise issues "significantly more complex and technical" than those in cases where the D.C. Court of Appeals has previously required expert testimony. Defs.' Mem. at 18. Burke replies that no expert is required because jurors could judge defendants' conduct based on their own knowledge and experience. Specifically, Burke argues that jurors will be able to understand his claims because they will be familiar with media coverage of the Iraq and Afghanistan wars, in particular those reports regarding personal and vehicle armor that proved inadequate to protect against improvised explosive devices.[10] The Court cannot agree.

To begin with, Burke's claims relate not to military ground vehicles, but rather to civilian helicopters, and extend beyond armor to flight plans, tracking equipment, radio communications, and training. Further, the D.C. Court of Appeals has required expert testimony regarding issues with which jurors would likely have an equivalent familiarity through media reports. For example, expert witnesses are required to establish the standard of care for police procedures. *See Butera v. District of Columbia*, 235 F.3d 637, 659 (D.C. Cir. 2001). Indeed, experts are often required even in areas where jurors could plausibly be expected to have first-hand experience. *See, e.g., Novak v. Capital Mgmt. & Dev. Corp.*, 570 F.3d 305, 313 (D.C. Cir. 2009)

---

[10] Burke also asserts that jurors will understand the context of the case because "Afghanistan is comparable to the old 'Wild West' — gunmen, builders, farmers, ranchers, schoolteachers, entering savage areas subject to armed marauders and trying to establish peace, civilization and the rule of law." Pl.'s Opp'n at 18. Jurors, in turn, will be familiar with the Old West because they will surely have seen "Gunsmoke or High Noon or the Outlaw Billy Wales [sic] or Lonesome Dove." This argument is logically flawed on multiple levels.

(nightclub security); *Freeman*, 477 A.2d at 719–20 (crosswalk safety). Given the complex and technical nature of Burke's claims — especially in comparison to other cases where expert testimony has been required — the Court concludes that expert testimony is necessary here.[11]

In turn, because Burke has failed to designate an expert who could establish the standard of care in this case, summary judgment for defendants is required. *See Brisbin v. Wash. Sports & Entm't, Ltd.*, 422 F. Supp. 2d 9, 13 (D.D.C. 2006) (granting summary judgment for the defendant where the plaintiff failed to designate an expert who could establish the applicable standard of care); *Beard*, 587 A.2d at 200 ("If the plaintiff fails to present sufficient evidence to establish the applicable standard of care, the court must enter judgment for the defendant.").[12]

## C. Burke Assumed the Risk of Injury

Finally, the Court turns to defendants' argument that they are entitled to summary judgment because, even if Burke could prove the standard of care applicable to his claims, he

---

[11] Burke further argues that expert testimony meeting the District's requirements would be impossible here because it is doubtful that there is a nationally accepted industry standard of care for "helicopter flights into danger zones in Afghanistan." Pl.'s Opp'n at 17. Here, Burke misunderstands the District's standard: an expert may establish the relevant standard of care by "clearly relat[ing] the standard of care to the practices in fact generally followed by other comparable [entities] or to some standard nationally recognized by such [entities]." *Phillips v. District of Columbia*, 714 A.2d 768, 773 (D.C. 1998) (quoting *Clark v. District of Columbia*, 708 A.2d 632, 635 (D.C. 1997)) (internal quotation marks omitted). Burke makes no showing that an expert could not do so in this case. Indeed, it is unclear what Burke hopes to gain by arguing that no standard of care could be established. Since he, as the plaintiff, bears the burden of demonstrating the applicable standard of care, a conclusive showing that no such standard exists would be fatal to his claims.

[12] The Court declines Burke's request to allow him time to find an appropriate expert. First, Burke filed his case in this forum; he should have considered — at least before the summary judgment phase — that its law might be applied to his claims such that an expert was needed. *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 820 (1985) ("In most cases the plaintiff shows his obvious wish for forum law by filing there."). Second, as is explained below, Burke could not prevail here even if he were able to prove the standard of care.

would be unable to recover because he assumed the risk of his injuries. Under District of Columbia law, "[a]ssumption of risk occurs when a plaintiff voluntarily consents to incur a risk. The consent may be express . . . or implied by conduct." *Martin v. George Hyman Constr. Co.*, 395 A.2d 63, 71 (D.C. 1978). "Also, the risk of a specific danger which is already in existence and known and appreciated by the plaintiff may be assumed." *Id.*; *see Scoggins v. Jude*, 419 A.2d 999, 1004 (D.C. 1980); *Harris v. Plummer*, 190 A.2d 98, 100 (D.C. 1963). Assumption of risk "may operate as a complete bar to liability." *Dennis v. Jones*, 928 A.2d 672, 676 (D.C. 2007).

Here, defendants contend that Burke "was fully aware of all of the risks . . . of which he now complains," and chose to face those risks for financial reasons and to have an opportunity "'to be in charge of his own operation.'" Def.'s Mem. at 10–11 (quoting Burke Dep. at 121). Burke responds that there is no evidence that he was aware of the specific risks related to the flight to Taluqan, and that the ambush constituted a "new element" of risk that he could not have anticipated. Burke's argument is unavailing.

Burke relies heavily on a pair of cases holding that a plaintiff does not assume a risk of harm where a "new element escalate[s] the [situation], transforming it from one whose risks were more or less known into one whose potentialities [the plaintiff] could in no way have anticipated." *Sinai v. Polinger Co.*, 498 A.2d 520, 524–25 (D.C. 1985); *accord Novak*, 570 F.3d at 314–15. For example, under this principle, the sudden use of weapons in a fist fight constitutes a "new element" that the participants could not have foreseen. *See Sinai*, 498 A.2d at 524–25; *Novak*, 570 F.3d at 314–15. Burke fairly states the holdings of these cases, but the Court cannot agree that they apply here.

13

First, there is ample evidence that Burke understood the broader security situation in Afghanistan, which he described as "tenuous" and "deteriorating." Burke Dep. at 127, 129. Indeed, Burke's twenty-two years as a professional soldier, including tours of duty in theaters of active combat, made him ideally suited to understand these risks fully. *See* Burke Dep. at 13–21. Further, there is clear evidence that Burke was aware of the risks involved in LBG's helicopter flights; in fact, during his deposition, Burke listed a number of measures that he felt would make the helicopter flights safer, all of which he "knew . . . were not in place" at the time of the ambush. Burke Dep. at 163.

Most critically, Burke clearly understood the risks involved in the flight to Taluqan. He knew that the helicopter was unarmored and would carry no guards. Burke Dep. at 151–52. He was aware that the Taliban attacked targets of opportunity, Burke Dep. at 129, and that LBG's helicopters were highly visible and audible from miles away. Burke Dep. at 161–62. And he wanted the helicopter to remain in Taluqan for as little time as possible because he was "worried" that even though the village was not a Taliban stronghold, the Taliban's mobility and rapid communications made staying there dangerous. Burke Dep. at 190.[13]

In light of Burke's expertise and avowed awareness of the specific risks to which he was exposed, no reasonable jury could conclude that the Taluqan ambush constituted a "new element" that transformed the flight from a situation "whose risks were more or less known into

---

[13] To the extent that Burke's deposition testimony is contradicted by the declaration he submitted in opposition to defendants' motion for summary judgment, *see* Burke Decl. ¶ 18 ("I did not have any knowledge of any danger or likely danger in this village"), the latter is insufficient to create a genuine issue of fact that can prevent summary judgment. *See Thompson v. Islam*, 2005 WL 3262926, at *3 (D.D.C. July 29, 2005) ("Plaintiff cannot create or resurrect a genuine issue of material fact and thereby defeat summary judgment by filing a self-serving affidavit that contradicts previous sworn testimony.").

one whose potentialities [Burke] could in no way have anticipated." *Sinai*, 498 A.2d at 524–25. To the contrary, it appears that an unplanned, opportunistic ambush in a remote village was precisely the eventuality that worried Burke. *See* Burke Dep. at 161–63, 190. Unlike the brawlers in *Novak* or *Sinai*, Burke could and did anticipate that lethal force might be used against him; he "possessed full comprehension and appreciation of the danger," *Morrison v. MacNamara*, 407 A.2d 555, 567 (D.C. 1979), and nevertheless voluntarily exposed himself to that danger. Accordingly, Burke would be unable to recover even if he could establish the applicable standard of care.

## IV. CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment must be granted. An appropriate order accompanies this memorandum opinion.

Henry H. Kennedy, Jr.
United States District Judge